**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | |
| | | **Case No.: CCB-19-526** |
| **KHALIL SHAHEED,** | * | **CCB-19-527** |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Pending before the Court is the defendant Khalil Shaheed's ("Shaheed") emergency motion to reopen his detention hearing and set conditions of pretrial release, ECF No. 23, filed on April 10, 2020. The government filed an opposition on April 14, 2020, ECF No. 27. Shaheed filed a supplemental submission on April 15, 2020 with a proposed release plan, ECF No. 28, and a letter from the proposed third-party custodian, Shaheed's mother, ECF No. 30. The Court has reviewed and considered the submissions of counsel and the Pretrial Services Report. The Court also has read the Memorandum Opinion and Order in *Banks v. Booth*, No. 20-CV-849(CKK), slip op. (D.D.C. Apr. 19, 2020), in which United States District Court Judge Colleen Kollar-Kotelly found a substantial likelihood that the District of Columbia Department of Corrections ("DCDOC") has been deliberately indifferent to the risks that COVID-19 poses to the health of detainees, including Shaheed who is detained at a DCDOC facility; an April 18, 2020, 38-page amici report prepared by independent investigators who recently observed the current conditions inside the DCDOC facilities; and a transcript of the April 15, 2020 hearing in *Banks v. Booth*. No hearing is necessary.

After weighing all of the factors in the Bail Reform Act, including the fact that as of yesterday, 90 detainees and 25 staff members have tested positive for COVID-19 at the facility where Shaheed, who has asthma for which he has previously been hospitalized, is detained, the Court finds that circumstances have changed materially since his detention was ordered in November 2019 and that

there now are a combination of conditions that will reasonably assure the safety of the community and Shaheed's appearance as required.

For the reasons stated in this Memorandum Opinion, Shaheed's motion to reopen the detention hearing and set release conditions is granted. Shaheed is ordered released from U.S. Marshal's custody subject to the conditions set forth below and in the accompanying Order Setting Conditions of Release, ECF No. 31.

## Procedural History

On November 6, 2019, a grand jury sitting in this Court returned two indictments against Shaheed. The first indictment charges him with distribution of a detectable amount of fentanyl and tramadol, resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count I); possession with intent to distribute a detectable amount of cocaine, heroin, and fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count II); possession of a firearm by a felon, in violation of 18 U.S.C § 922(g)(1) (Count III); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count IV). ECF No. 1 in CCB-19-526. The second indictment charges him with possession with intent to distribute a detectable amount of cocaine and fentanyl, in violation of 21 U.S.C. § 841(a)(1). ECF No. 1 in CCB-19-527. The maximum penalty for Counts I and IV in CCB-19-526 is life imprisonment; the maximum penalty for Count II in CCB-19-526 and the single count in CCB-19-527 is 20 years' imprisonment; and the maximum penalty for Count III in CCB-19-526 is 10 years' imprisonment. There is a mandatory minimum penalty of 20 years' imprisonment for Count I and a mandatory minimum penalty of five years' imprisonment for Count IV in CCB-19-526.

On November 20, 2019, Shaheed appeared for his initial appearance and was appointed counsel. At the hearing, the government moved for his detention. On November 21, 2019, after reviewing the Pretrial Services Report and hearing arguments from counsel, the Court ordered Shaheed detained pending trial on these charges because there was clear and convincing evidence that

no condition or combination of conditions could reasonably assure the safety of the community or his presence at trial. ECF No. 13. Since his detention was ordered, Shaheed has been detained at the Correctional Treatment Facility ("CTF"), a DCDOC facility.

Shaheed now asks the Court to reconsider its detention order in light of the COVID-19 public health emergency, the fact that he is detained in a facility where numerous inmates have tested positive for COVID-19, and the fact that he has asthma, an underlying health condition that may increase his risk of exposure and harm. The Court may reopen a detention hearing and reconsider its decision upon a finding that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). At the time of the November 2019 detention hearing, no one knew that four months later there would be a public health emergency due to a worldwide pandemic that poses a potential threat to everyone, including pretrial detainees. Therefore, the Court will reconsider its decision, taking the current public health crisis into account. *See United States v. Jefferson*, No. CCB-19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020) (noting that the COVID-19 public health crisis is a factor to consider); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3–4 (D. Md. Mar. 17, 2020) (same).

### The Bail Reform Act

Under the Bail Reform Act, when a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)" or "an offense under section 924(c)" of Title 18, both of which are the case here, and the Court finds probable cause to believe the defendant committed the crime, there is a presumption, subject to rebuttal by the defendant, that "no combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C.

§ 3142(e)(3)(A), (B).  The presumption of detention "places 'a limited burden of production—not a burden of persuasion' on the defendant to 'com[e] forward with evidence that he does not pose a danger to the community or a risk of flight.'"  *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (quoting *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)).  When the defendant meets his burden of production, it "remains a factor to be considered among those weighed by the district court" but "does not eliminate the presumption favoring detention." *Id.* (quoting *English*, 629 F.3d at 319).

The government bears the burden of proving by a preponderance that no condition or combination of conditions will reasonably assure the defendant's appearance and by a clear and convincing showing that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(f); *see Khusanov*, 731 F. App'x at 21 (noting that the "ultimate burden" of proof remains on the government to "mak[e] a preponderance showing that the defendant poses a risk of flight and a clear and convincing showing that he presents a danger to persons or the community").[1]

The Bail Reform Act requires consideration of the following factors: "the nature and circumstances of the offense charged," "the weight of the evidence against the person," the person's history and characteristics, and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

If, upon consideration of these factors, the Court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other

---

[1] *See also United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the government retains the 'burden of persuasion.'") (citing *United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001)); *United States v. Moss*, 887 F.2d 333, 338 (1st Cir. 1989); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986); *United States v. Portes,* 786 F.2d 758, 764 (7th Cir. 1985); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).

person and the community," then the Court "shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Alternatively, if the Court finds that there are conditions or a combination of conditions that will reasonably assure the person's appearance and the safety of any other person and the community, the person may be released subject to certain conditions, including, among others, home confinement and third-party custodianship. 18 U.S.C. § 3142(c)(1).

The Supreme Court has held that pretrial detention is disfavored. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). In *Salerno*, the Supreme Court ultimately approved pretrial detention based on dangerousness, but the Court was clear that the Bail Reform Act is preventative, rather than punitive, in nature. *Id.* at 747–48. Consistent with the Supreme Court's holding, the Bail Reform Act states that nothing in it "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

## Analysis of Bail Reform Act Factors

Personal History and Characteristics, Mental and Physical Health, and Employment History

Shaheed, 26, was born in Baltimore and has lived in Maryland his entire life. He does not have a U.S. passport and has never traveled outside of the United States. His parents and four of his siblings, with whom he has daily contact, live together in Baltimore. His fiancée, who is pregnant with their first child, lives in Baltimore. Shaheed was living with her when he was arrested on these federal charges.

Shaheed reported he has suffered from depression and received medication for depression while incarcerated in 2017. He is not currently taking any medications for depression or any other mental illness. Shaheed has a substance abuse problem. At 13, he began smoking marijuana and taking Percocet pills, and he was using both drugs on a weekly basis before his arrest. He reported that once his monthly prescription Percocet supply would run out, he would use heroin until he could

be resupplied with Percocet pills. Shaheed also used cocaine and cocaine base approximately twice a week before his arrest. He consumes alcohol socially.

Shaheed has asthma and requires an inhaler. This health condition was reported to Pretrial Services by the defendant, his mother, and his fiancée in November 2019. Counsel provided the Court with a March 23, 2020 medical record from CTF. According to the medical record, during Shaheed's initial medical evaluation at the jail in November, he requested and received an inhaler for his asthma. That same March 23 medical record shows that Shaheed told the nurse that, because of his asthma, he previously has been prescribed steroids, hospitalized, and intubated. In his mother's letter to the Court, she reports that her son has been hospitalized because of asthma.

At the time of his arrest, Shaheed was working for his grandfather's construction business on an as-needed basis. One month before his arrest, he had enrolled in a year-long HVAC certification course through All-State Career School, a vocational and technical school, located in Baltimore. From 2012 until 2017, he was employed full-time as a merchandiser for Canada Dry in Baltimore. His employment ended when he was arrested on related state charges. Before Canada Dry, Shaheed was employed full-time with Dunbar Armored in Baltimore from 2011 until 2012. According to his mother, Shaheed worked at a McDonald's restaurant for approximately two years while he was in high school.

<u>Criminal History and Prior Performance Under Court Supervision</u>

Shaheed has two prior criminal convictions. In June 2015, at 22, he was arrested for possession with intent to distribute an unspecified drug in Baltimore County and was released on personal recognizance. Seven months later, in January 2016, he pled guilty and received probation before judgment, two years unsupervised probation, and a $1,000 fine. In April 2018, he was arrested and charged with discharging firearms, regulated firearm-illegal sale/transfer, and ammunition/sale to a minor in Baltimore City. He was held without bond. In August 2018, he pled guilty to the charge

of regulated firearm-illegal sale/transfer and received a sentence of four years' confinement with three years suspended and three years of supervised probation.  He was on probation for that conviction when he was arrested on these charges.[2]  He has no history of failing to appear for court appearances.

Nature and Circumstances of the Offense

The Court next turns to the nature and circumstances of the offense.  According to the government, law enforcement began investigation and surveillance of Shaheed after an individual died of a drug overdose in October 2017.  Gov't Opp'n 5.  The government proffers evidence that the death occurred after the victim ordered heroin from Shaheed and arranged to meet him to obtain the heroin.  *Id.* at 6.  Through subsequent surveillance, law enforcement observed Shaheed's continued drug dealing.  *Id.* at 5.  In November 2017, law enforcement executed a search warrant of his car and home.  *Id.*  When they executed the warrant for his car, Shaheed was engaged in a suspected drug transaction, and agents recovered narcotics and a loaded firearm from the floorboard underneath where Shaheed was sitting.  *Id.*  When they searched his home, they recovered a second firearm.  *Id.*  Two years later, in November 2019, a federal grand jury indicted Shaheed in CCB-19-526 based on his alleged criminal conduct in October and November 2017.[3]  The second indictment against Shaheed is based on an August 2019 traffic stop in Carroll County.  ECF No. 1 in CCB-19-527.  Police searched Shaheed's car and found a detectable amount of cocaine and fentanyl.  Gov't Opp'n 5.  Based on that evidence, the grand jury indicted him in CCB-19-527.  When Shaheed was arrested on the federal charges on November 20, 2019, arresting officers observed evidence of narcotics in his home, and a

---

[2] There was a no-bond arrest warrant issued by Baltimore City on December 6, 2019 based on an alleged violation of probation due to these federal charges.  Baltimore City Circuit Court Judge Charles J. Peters quashed the warrant today, allowing Shaheed to be released from federal custody directly to his parents' house rather than entering state custody and seeking release at a bond hearing.

[3] The related state charges were "dismissed due to uncompleted drug testing."  Gov't Opp'n 5.

search warrant was obtained. *Id.* The subsequent search yielded a third firearm and additional suspected narcotics. *Id.* at 5–6. The nature and circumstances of these offenses are very serious.

<u>Weight of the Evidence</u>

The Court next considers the weight of the evidence. With respect to the possession with intent to distribute narcotics charge (Count II) and the two firearms charges (Counts III and IV) in CCB-19-526, the weight of the evidence is quite strong. In November 2017, law enforcement seized, pursuant to a search warrant, a loaded firearm from underneath the driver's seat of Shaheed's vehicle while Shaheed was sitting in the driver's seat engaged in a suspected narcotics transaction. Police also found a detectable amount of cocaine, heroin, and fentanyl in Shaheed's car. On the same day, police seized another firearm from his home pursuant to a search warrant. With respect to the charge in CCB-19-527, possession with intent to distribute a detectable amount of cocaine and fentanyl, the evidence appears strong as well. After conducting a traffic stop in August 2019, Carroll County police searched Shaheed's vehicle and found narcotics in his vehicle.

The parties offer different interpretations of the weight of the evidence as to the most serious charge, possession with intent to distribute narcotics resulting in death (Count I in CCB-19-526). According to the government, in October 2017, investigators developed evidence linking Shaheed to a victim of a heroin overdose through an examination of the victim's cellular phone. Gov't Opp'n 6. The phone data showed that the victim ordered what the victim believed to be heroin from Shaheed a few days before he was found dead, and the victim arranged to meet with Shaheed for the sale. *Id.* The final date of the text messages between the victim and Shaheed was October 14, 2017, and as of the early morning hours on that day, the victim had no further outgoing text messages. *Id.* His body was found two days later in his apartment, and syringes containing fentanyl and tramadol were recovered in his hand. *Id.* The autopsy showed that fentanyl and tramadol intoxication was the cause

of the victim's death. *Id.* Information developed by investigators led to the identification of Shaheed as a contact in the victim's phone and as a source of heroin for the victim. *Id.*

In his motion, Shaheed argues that the evidence for this charge is not as clear-cut as it appeared at the November 2019 detention hearing. Def.'s Mot. 17–18. He argues that there are "conflicting reports about how long the decedent had been deceased when his body was discovered on October 17, 2017," and although there is evidence that the decedent texted a number believed to be Shaheed's cell phone number on October 14, 2017, "the phone also contains messages from October 15, 16, and 17 that are marked as having been read, or at least opened." *Id.* Additionally, Shaheed's attorneys report that they have "begun consulting with multiple experts with respect to the medical examiner's conclusion as to cause of death" and, "[w]hile these consultations are in their preliminary stages, there appears to be reason to seriously question the accuracy of the medical examiner's toxicology report with respect to the concentrations of different drugs in the decedent's body." *Id.* at 18.

The Court will not evaluate the competing proffers of evidence. It does appear, however, that the weight of the evidence for the most serious charge against Shaheed may not be as strong as it seemed at the detention hearing when discovery had not yet been produced. In any event, the weight of the evidence is but one factor that the Court must consider. Some courts have considered it the least important factor, while others consider it one of the most important factors. *See, e.g., United States v. English*, 629 F.3d 311, 317 (2d Cir. 2011) (affirming detention order by judge who observed that the weight of the evidence "is one of the most important factors"); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (finding the weight of the evidence factor to be the least important of the four factors); *United States v. Tapia-Garcia*, No. 19MJ3905-JLB-WQH, 2019 WL 4963011, at *2 (S.D. Cal. Oct. 8, 2019) (noting that the weight of the evidence is "the least important factor"); *see also United States v. Calabrese*, 436 F. Supp. 2d 925, 927 (N.D. Ill. 2006) (stating that the finding in *Gebro* and other cases that "the weight of evidence is least important is . . . an off-key but well-intentioned attempt to

remind us of the rule that detention is not to be ordered simply because we are convinced that the accused is guilty . . . . [T]he weight of evidence may or may not be important, but no absolute rule governs"). Here, the Court considers it and weighs it along with the other Bail Reform Act factors.

<u>Nature and Seriousness of Danger to the Community</u>

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). It is under this factor that the Court considers the current public health crisis. The Court has found that reducing the number of pretrial detainees during this public health emergency, as a general matter, is safer for jail communities and the greater community. *See United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020); *see also Banks*, slip op. at 25 ("No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities. Plaintiffs also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large. Additionally, if Plaintiffs contract COVID-19 and experience complications, 'they will be transported to community hospitals— thereby using scarce community resources (ER beds, general hospital beds, ICU beds).'"). Over the past three weeks, judges, sheriffs, and other public officials around the country have attempted to reduce the number of incarcerated people while ensuring public safety.

In Shaheed's motion, he claims that he is unsafe where he is housed, that 33 detainees at the facility have tested positive for COVID-19, that he has asthma, an underlying health condition that could expose him to greater harm if he contracts the disease, and that the jail is not equipped to handle the outbreak. Def.'s Mot. 4. In its response, the government argues that Shaheed "relies on the speculative prospect of a mass COVID-19 outbreak at . . . the pretrial facility where he currently is housed." Gov't Opp'n 3. The government further argues that "the defendant does not allege that he has been diagnosed with COVID-19, or even that he has had contact with any of the detainees who

have been diagnosed with COVID-19," and that the jail "continues to take precautionary measures to prevent transmission of COVID-19." *Id.* at 4. In a footnote, the government states: "As of the time of this writing the Government is aware of 53 inmates in DC DOC custody who have tested positive for COVID-19, and has learned that 9 have recovered, and that 1 individual has died reportedly with COVID related health issues." *Id.* at 4 n.1.

In evaluating the impact of COVID-19 on the pretrial detention decision in this case, the Court relies on the best evidence currently available. As of yesterday, the D.C. government reported there were 90 DCDOC detainees who have tested positive (40 were in isolation and 50 have recovered); there were 840 detainees in quarantine (more than half of the DCDOC inmate population); and one pretrial detainee had died from COVID-19.[4] DCDOC personnel also have been exposed. As of yesterday, there were 25 employees who had tested positive; 134 additional employees in quarantine; and one employee has died from COVID-19. These numbers show that as of April 19 there was a combined total of 115 confirmed cases of COVID-19 among detainees and staff, 974 additional detainees and staff in quarantine, and two deaths. These numbers are not speculative. The growing infection rate among jail staff and detainees, which started on March 25, 2020 with one positive inmate and 26 days later has increased to 90 inmates and 25 employees, appears to the Court to be a mass viral outbreak.[5]

Under these circumstances, the Court will not require proffer or proof that Shaheed has been in contact with detainees or staff who have been diagnosed with COVID-19. He could not possibly

---

[4] *See* Public Safety Agency COVID-19 Case Data, https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data, last visited Apr. 20, 2020.

[5] According to the CDC, an outbreak is "an increase, often sudden, in the number of cases of a disease above what is normally expected in that population in . . . a . . . limited geographic area." Principles of Epidemiology in Public Health Practice, Lesson 1, Section 11 (3d ed. 2011), *available at* https://www.cdc.gov/csels/dsepd/ss1978/lesson1/section11.html.

know all of the people who could have exposed him to the virus, many of whom have not yet been tested or may not know they have been exposed.

Nor will the Court require that Shaheed actually have COVID-19 before considering his release. The Centers for Disease Control and Prevention ("CDC"), along with every public health official in the nation, advises that "[t]here is currently no vaccine to prevent coronavirus disease 2019 (COVID-19) . . . [and] [t]he best way to prevent illness is to avoid being exposed to this virus."[6] The potential exposure to the virus is an imminent threat to Shaheed, and the Court will not wait until he actually contracts the disease before considering releasing him. *See Coreas v. Bounds*, No. TDC-20-780, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020) (finding that threat of infection from coronavirus was imminent even though no detainees at the detention facility where plaintiffs were housed had contracted the virus yet).[7]

The government's final argument—that CTF "continues to take precautionary measures to prevent transmission of COVID-19"—is unpersuasive. *See* Gov't Opp'n 8–10 (citing various precautionary measures allegedly taken by the jail to prevent transmissions). Yesterday, a federal district judge in Washington, D.C. found that DCDOC detainees and inmates had provided substantial evidence that DCDOC was aware of the risks that COVID-19 poses to their health and has "disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus," thereby "establish[ing] a likelihood of success in showing deliberate indifference."

---

[6] Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[7] Waiting until a detainee has actually been diagnosed with COVID-19 does not make sense. At that point, the virus has taken hold, and it may be too risky to release him.

*Banks v. Booth*, No. 20-CV-849(CKK), slip op. at 22 (D.D.C. Apr. 19, 2020).[8]  This finding was based

on an April 18, 2020 report prepared by court-appointed amici, two neutral investigators who

observed what was actually happening inside jail.  On April 10, 11, and 12, the two independent

investigators walked throughout the DCDOC facilities, interviewed staff and inmates, and reviewed

thousands page of medical records.  The inspectors, who were acting as neutral observers for the

parties to the lawsuit, found that social distancing was not being enforced.  The inspectors reported

that the inmates lack adequate cleaning equipment and training to disinfect cells, toilet areas, and

communal areas.  Inmates with the virus are isolated, prohibited from showering or cleaning their

cells, unable to call family or their attorneys, and may not change their soiled clothes, linens, or masks

while infected.  Although no one cannot predict what may happen at the jail in the coming days and

weeks, the investigators made the following conclusion regarding the ability to prevent future

transmissions:

> Deprivation of showers, the absence of any ability to contact family members, the lack
> of access to legal calls, clean clothing and clean linens are plainly a disincentive and are
> likely to deter inmates from reporting symptoms of COVID-19.

Amicus Curiae Report 22–23, *Banks*, slip op. Att. 1 (noting that "[m]ost of the inmates *amici*

interviewed in the isolation units stated the conditions are far too punitive, noting that if they had it

to do over again, they would not have reported their symptoms"); *see also Banks*, slip op. at 22 ("As the

DOC is primarily relying on inmates to self-report symptoms of COVID-19, the punitive conditions

---

[8] Of particular relevance here, the Court found that the two pretrial-detainee plaintiffs, who are presumed innocent, are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  *Banks*, slip op. at 10 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).  The pretrial detainees, in order to prevail on their due process claim, "need only show that prison conditions are objectively unreasonable." *Id.* at 11.  The Court found that they had shown a likelihood of success under an "objectively unreasonable" standard and the higher standard of deliberate indifference that applies when a person already has been convicted of a crime.  *Id.* at 15, 22.

of isolation make it more likely that inmates will hide their symptoms to avoid the potential for

isolation and continue to infect others in the general population.").  The firsthand accounts by neutral

investigators and a federal judge's preliminary finding of deliberate indifference to the risks posed by

COVID-19 to the health of detainees raise serious questions about the jail's present ability to prevent

the transmission of the disease.[9]

Having established that there is an outbreak of COVID-19 inside the jail where Shaheed is

detained, the Court now considers how this outbreak might impact Shaheed.  The government argues

that "[n]otwithstanding the COVID-19 outbreak, [Shaheed's physical condition] does not weigh

heavily, if at all, in favor of the defendant's release."  Gov't Opp'n. 7.  The Court disagrees.  Pretrial

detainees at CTF, including Shaheed, currently face an increased "risk of contracting COVID-19" and

"serious health consequences, including death."  *Banks*, slip op. at 23.  The fact that every detainee at

CTF faces this risk does not diminish the risk to Shaheed.  *See id.*

The "physical condition" factor weighs more heavily in favor of release because Shaheed has

asthma and requires an inhaler.  This documented medical condition was reported to Pretrial Services

before the detention hearing in November.  Upon arrival at the jail, Shaheed sought and received an

inhaler.  A March 23 CTF medical record indicates that Shaheed reported to medical staff that because

of his asthma, he previously has been prescribed steroids, hospitalized, and intubated.  In her letter to

the Court, his mother reports that her son has been hospitalized due to asthma.  According to the

CDC, asthma is an underlying health condition that may make Shaheed more vulnerable to COVID-

---

[9] Even before the decision in *Banks v. Booth* was issued, the Court did not find persuasive the
government's claim that the jail's precautionary measures prevented the transmission of COVID-19.
When Shaheed filed his motion on April 10, he reported that 33 inmates were positive; when the
government filed its opposition on April 14, it reported that 58 inmates were positive; as of April 19,
90 inmates have tested positive.  The numbers alone show that the precautionary measures are not
preventing the transmission of COVID-19 within the jail.

19. "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[10] The fact that Shaheed is asthmatic and may be at higher risk of exposure and harm weighs in favor of release, especially considering he is detained in a facility where the infection rate is increasing daily.[11]

Next, the Court must consider whether the particular facts in this case compel a conclusion that Shaheed's release, even subject to stringent conditions, would not reasonably assure the safety of the community. *See United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement . . ."); *see also United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop . . . A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis.").

The government argues that if Shaheed is released, he will return to drug-trafficking and possessing firearms. Gov't Opp'n 7. Based on the government's proffer and the indictments, Shaheed appears to have a history of selling illegal narcotics and unlawfully possessing firearms. These are serious potential dangers. The Court is mindful that Shaheed is charged with distribution of fentanyl and tramadol that resulted in someone's death – an incredibly serious potential danger. The Court is also mindful that the *mens rea* for that crime is intent to distribute narcotics, not intent to cause death.

---

[10] *See* Coronavirus Disease 2019 (COVID-19): People with Moderate to Severe Asthma, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

[11] The Court finds that the presumption of detention as to dangerousness has been rebutted due to the COVID-19 health crisis.

*See United States v. Alvarado*, 816 F.3d 242, 250 (4th Cir. 2016).  The government has not alleged that Shaheed intended to cause the victim's death.  This distinction is important in the context of evaluating the potential danger that would be posed if Shaheed were released, because if the Court can find conditions that reasonably assure he will not return to selling narcotics, it follows that the same conditions will reasonably assure that no one will get harmed as a result of him selling narcotics.

Conditions of Release

Having identified the specific nature of the danger and how serious it is, the Court now considers whether there are available release conditions that will address those concerns and "reasonably assure" the safety of the community.  The statute requires "reasonable assurance," not a "guarantee."  *United States v. Orta*, 760 F.2d 887, 891–92 (8th Cir. 1985).  The Court finds that there are conditions that will reasonably assure the safety of the community.

The first condition is that he live with his parents at their home in Baltimore.  His mother has agreed to serve as a third-party custodian.  Pretrial Services has approved his parents' home as a suitable residence and his mother as a suitable third-party custodian.  The Court agrees.  Shaheed was not living with his parents when he allegedly committed these crimes, and the firearms recovered in this case were not found at his parents' house.  His mother, 50, works full-time for the State of Maryland Department of Human Services.  Due to the pandemic, she is currently working from home.  His father, 51, works for Republic Services as a truck driver and returns home from work in the late afternoon on weekdays.[12]  Four of Shaheed's younger siblings, ages 21, 19, 17, and 13, also live at

---

[12] The Court remembers Shaheed's parents from the detention hearing.  They along with several other family members were present in the gallery.  The Court recalls thinking that if circumstances were different, they appeared to be excellent third-party custodians.  This afternoon, the Court held a conference call with counsel, a Pretrial Services Officer, and Shaheed's mother.  The conditions of release and the potential penalties for violating release conditions were reviewed.  Mrs. Shaheed assured the Court she was willing to be her son's third-party custodian and understood her responsibilities.

16

home.  His 21-year-old sister is currently taking online classes with the University of Maryland at College Park.  No one in the home has a criminal history.

The second condition is home incarceration monitored by a location monitoring technology that Pretrial Services deems appropriate.  Shaheed is restricted to his parents' residence except for medical or emergency purposes approved by Pretrial Services.  This condition will provide additional assurance that Shaheed stays at his parents' house and does not leave unless given permission by Pretrial Services.

The remaining conditions include no use of controlled dangerous substances unless prescribed by a physician; drug testing; and substance abuse and mental health evaluation and counseling, if deemed appropriate by Pretrial Services.  Shaheed must comply with all directives from federal, state, and local government pertaining to public health, including COVID-19.  In this regard, Shaheed's mother reports that upon returning home he will be able to self-quarantine in their basement.  She further reports that her family has been practicing social distancing and will not have anyone except for immediate family at their home.[13]

## Access to Counsel

Shaheed argues that the current conditions at the jail where he is detained impede his access to counsel.  Def.'s Mot. 21–22.  The government suggests that access to counsel is not a relevant

---

[13] The government does not argue that Shaheed is a flight risk.  In any event, the Court finds that Shaheed does not pose a risk of non-appearance, and to the extent there is a risk of flight, the release conditions will reasonably assure his appearance.  Shaheed has no history of failing to appear for court appearances.  He has strong ties to Baltimore, including his parents, siblings, and fiancée who's expecting their first child in May.  Additionally, the pandemic has significantly curtailed travel throughout the region, including through Governor Hogan's March 30, 2020 order that all Marylanders stay at home, providing additional assurance that Shaheed will not leave the area.  *See United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[T]he court finds that the circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial . . . .").  Moreover, Shaheed will be subject to the strictest release conditions currently available, including home incarceration and location monitoring.

consideration under the Bail Reform Act.  Gov't Opp'n 27.  The Court agrees that Section 3142(g) of the Bail Reform Act does not specifically identify access to counsel as a factor.  However, Section 3142(i) of the Act requires a judicial officer in a detention order "to direct that the person be afforded reasonable opportunity for private consultation with counsel."  18 U.S.C. § 3142(i)(3).  Under the current circumstances in the facility where Shaheed is detained, it does not appear that he is being "afforded reasonable opportunity for private consultation with counsel."  Thus, the Court will consider access to counsel as a factor relevant to Shaheed's release or continued detention.

The government claims that Shaheed has the ability to communicate with his attorneys, because DCDOC "has continued to allow in-person legal visits for any defendant actively in trial" and "defendants are also able to have one free 30-minute call each day with their attorney of record on an unsecured line."  Gov't Opp'n 27.  While an in-person legal visit may be a theoretical option for counsel, this is not a practical option.  There are significant health risks to attorneys and their staff if they enter the jail under these circumstances.  As for the one free 30-minute legal call each day with an attorney of record on an unsecured line, that, too, appears to be theoretical.  In the April 15 hearing in *Banks v. Booth*, Judge Kollar-Kotelly stated, "Lawyers are having a terrible time getting in touch with [their clients].  Forget 30 minutes or anything else.  They're not getting 10 minutes."  Apr. 15, 2020 Hr'g Tr. 74:8–11, ECF No. 93-2 in *United States v. Remarque*, PX-19-cr-39.  In her subsequent written opinion, Judge Kollar-Kotelly found:

> [I]nmates in isolation at CTF are not permitted to use the telephone for any reason, including legal calls. . . . And, this issue persists for those in other housing units. Telephone calls in confidential settings are generally organized by DOC case management staff; however, most of those staff are either on quarantine or working remotely.  "Thus, as a general matter, there has been no access to confidential legal calls for inmates confined on quarantine and non-quarantine housing units."  Some inmates have been able to make calls using telephones in the day rooms; however, these calls are monitored and do not afford the confidentiality required to communicate about legal issues with counsel.

18

*Banks*, slip op. at 21–22 (quoting Amicus Curiae Report 21–22).  Under these circumstances, even if the Court entered an order directing that Shaheed have a "reasonable opportunity for private consultation with counsel," 18 U.S.C. § 3142(i)(3), there is no evidence it would be honored.  Thus, the Court has factored Shaheed's current inability to confer with counsel confidentially in this decision.

## Conclusion

In conclusion, the Court finds that there is a combination of conditions that will reasonably assure Shaheed's appearance as required and the safety of the community.  The defendant's emergency motion to reopen his detention hearing and set conditions of pretrial release is granted, and Khalil Shaheed is released from the custody of the U.S. Marshal's subject to the conditions identified in the accompanying Order Setting Conditions of Release, ECF No. 31.


  April 20, 2020                                                                /S/
Date                                                            Deborah L. Boardman
                                                                United States Magistrate Judge